UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JOHN POTOCHNIAK,

                Plaintiff,

v.                                        Case No. 5:06-cv-20-Oc-10GRJ

MICHAEL J. ASTRUE[1], Commissioner of
Social Security,

                Defendant.
_____

## REPORT AND RECOMMENDATION[2]

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for a period of disability and disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 7), and both parties have filed briefs outlining their respective positions. (Docs. 14 & 15.) For the reasons discussed below, the Court finds that the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits on January 29, 2002, alleging a disability onset date of January 7, 2002. (R. 87-

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

90.) Plaintiff's application was denied initially (R. 40-42), and upon reconsideration. (R. 44-46.) Thereafter, Plaintiff timely pursued his administrative remedies available before the Commissioner, and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 47.)

The ALJ conducted Plaintiff's administrative hearing on August 24, 2004. (R. 396-416.) Plaintiff was represented by counsel at the hearing. The ALJ issued a decision unfavorable to Plaintiff on October 13, 2004. (R. 29-39), and Plaintiff filed a timely request for review of the hearing decision with the Social Security Administration's Office of Hearings and Appeals. (R. 62-65.) The Appeals Council remanded Plaintiff's Request for Review on December 3, 2004. (R. 67-70.)

A supplemental hearing was held on May 11, 2005. (R. 417-49.) Plaintiff was, again, represented by counsel at the hearing. On July 25, 2005, the ALJ issued a new decision, again denying Plaintiff's claim. (R. 10-21.) Plaintiff filed a timely request for review (R. 9) and on November 25, 2005, the Appeals Council denied the request . (R. 5-8.) On January 17, 2006, Plaintiff filed the instant appeal to this Court. (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[3] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such

---

[3] See 42 U.S.C. § 405(g).

relevant evidence as a reasonable person would accept as adequate to support the conclusion.[4]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[5] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[6] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[7]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[8] The impairment must be severe, making Plaintiff

---

[4] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[5] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[6] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[7] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[8] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2003) (All further references to 20 C.F.R. will be to the 2003 version unless otherwise specified.).

unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[9]

The ALJ must follow five steps in evaluating a claim of disability.[10] First, if a claimant is working at a substantial gainful activity, she is not disabled.[11] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[12] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[13] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[14] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[15]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[16] The burden then temporarily shifts to the Commissioner to

---

[9] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[10] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[11] 20 C.F.R. § 404.1520(b).

[12] 20 C.F.R. § 404.1520(c).

[13] 20 C.F.R. § 404.1520(d).

[14] 20 C.F.R. § 404.1520(e).

[15] 20 C.F.R. § 404.1520(f).

[16] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

demonstrate that "other work" which the claimant can perform currently exists in the national economy.[17] The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[18]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[19] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[20]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[21] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such

---

[17] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[18] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[19] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[20] Walker, 826 F.2d at 1003.

[21] Wolfe, 86 F.3d at 1077-78.

evidence.[22] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III. **SUMMARY OF THE RECORD EVIDENCE**

Plaintiff, born on September 12, 1960, was forty-three at the time of the ALJ's decision. (R. 421.) He completed two years of college, receiving an associates degree in electronics. *Id*. Plaintiff last worked as an electrician, as a research and development technician, and as an electronic technician. (R. 402-03.)

Plaintiff claims that he became disabled on January 7, 2002 due to back pain, status post spinal fusion surgery, leg and ankle pain, arthritis, breathing problems, and migraine headaches. (R. 14-15.) Specifically, Plaintiff's back pain made it difficult to set up areas and sit in one position for a period of time. (R. 407.) Plaintiff claims that it became difficult for him to operate the small equipment for his job due to the side effects of the medication - shakiness and edginess. (R. 407.)

Plaintiff has a history of surgical procedures in his right leg. (R. 297.) In 1978, Plaintiff had a right tibia-fib fracture. *Id*. In 1999, he underwent right knee arthroscopic surgery and a right tibial osteotomy[23]. *Id*. Plaintiff also had hardware removed from his right leg in February of 2001. *Id*.

According to progress notes dated July 19, 2000, Plaintiff complained of consistent frontal headaches for one month. (R. 319.) In his brief, Plaintiff also suggests

---

[22] *Id.*

[23] Cutting a bone, usually by means of saw. Lippincott, Williams & Wilkins, Stedman's Medical Dictionary (27th ed. 2000).

6

that on February 6, 2002, March 11, 2002 (R. 310-11) and September 13, 2002 (R. 307) additional progress notes suggest complaints of headaches. According to Plaintiff the notation "ha" on the progress notes refers to headaches.[24]

The medical records further reflect that Dr. Scott A. Webb, D.O. examined Plaintiff at the Florida Spine Institute in September 2001. At that time Plaintiff complained of low back pain. (R. 297-98.) Dr. Webb prescribed Vioxx (R. 298), ordered an MRI of the lumbar spine and referred Plaintiff to Dr. Constantine G. Bouchlas, M.D., also of the Florida Spine Institute. (R. 295, 298.)

The records from Dr. Bouchlas disclose that the MRI evidenced facet ligamentum hypertrohpy and a possible component of discogenic pain[25] with disc degeneration. (R. 296.) Dr. Bouchlas recommended corrective surgery to fix Plaintiff's leg discrepancy which seemed to put abnormal mechanical stress on his lumbar spine. *Id*.

In December of 2001, Dr. Webb recommended spinal fusion surgery. (R. 29-91.) Dr. Webb opted against conservative surgery because of Plaintiff's complaints of ongoing significant symptoms which restricted his activities on a daily basis. (R. 291.)

On January 28, 2002, after having undergone spinal fusion surgery, Plaintiff saw Dr. Webb. (R. 289.) Although Dr. Webb observed some surgical discomfort he noted that Plaintiff had significant improvement from the surgery. Notably, Plaintiff reported to Dr. Webb that he was walking in the mall daily and had no new complaints. *Id*. Dr.

---

[24] Doc. 14, p. 3. The Court, however, is unable to decipher the notation of "ha" on the referenced progress notes.

[25] Denoting a disorder originating in or from intervertebral disk. Lippincott, Williams & Wilkins, Stedman's Medical Dictionary (27th ed. 2000).

Webb ordered physical therapy three times a week for four weeks. *Id*. Six months after surgery, Plaintiff complained of continued pain in the back and right leg, although the pain was not as intense as prior to surgery. (R. 288.)

A letter from Dr. Scott L. Ray, D.O., P.A., dated August 14, 2002, sent to the state division of disability determination described the treatment Plaintiff had received from Dr. Ray since January 1997. (R. 212-13.) According to Dr. Ray, Plaintiff continued to suffer from lower pack pain and decreased range of motion, as well as ongoing symptomatology in the right lower extremity. *Id*. Dr. Ray stated that "Mr. Potochniak's disabilities are extremely advanced with very low probability of significant improvement i the future" and Dr, Ray estimated that Plaintiff's disability "could be as high as 75% of the body as a whole. (R. 213.)

On August 19, 2002, Plaintiff underwent an orthopaedic consultative examination by Dr. H. D. Wassel, M.D., at the behest of the Office of Disability Determinations. (R. 214-22.) Plaintiff complained of constant pain in his back, leg and ankle, migraine headaches and sleepiness. (R. 214-15.) Dr. Wassel noted a limitation of motion in the right knee and some crepitation[26]. (R. 217.) He also stated there was a straightening of the lumbar lordosis with considerable palpable spasm in the paravertbral muscles. *Id*. Dr. Wassel noted a short-leg gait on the right side and a shortened stride. He opined that an assistive device should be used in the left hand for ambulation. (R. 218.) Dr.

---

[26] The sensation felt on placing the hand over the seat of a fracture when the broken ends of the bone are moved; noise or vibration produced by rubbing bone or irregular defenerated cartilage surgaces together as in arthritis and order conditions. *Id*.

Wassel stated that Plaintiff's walking was impaired because of Plaintiff's recent surgery. *Id*.

Plaintiff states in his brief that after the surgery Plaintiff was seen by his primary care physician for continued low back pain.[27] According to the legible progress notes, the primary care doctor prescribed medication for the pain. (R. 306-08.)

A physical examination with Dr. Ashraf Hanna, M.D. revealed mild lumbar tenderness, mild pain with trunk flexion and extension. (R. 286.) Dr. Hanna prescribed hydrocordone for pain, a Duragesic patch and Neurontin for neuropathic pain. *Id*. At a follow-up visit Plainitff continued to complain of low back pain, right leg pain and right ankle pain. (R. 291.) Dr. Hanna prescribed the same medications. *Id*.

In a follow-up treatment note on February 5, 2003, Dr. Harry Steinman reported that Plaintiff had been placed on a patellar tendon bearing brace to reduce the weight across his ankle. (R. 361.) Dr. Steinman also noted that Plaintiff's x-rays were consistent with lateral patellofemoral arthrosis. (R. 362.) On October 7, 2003, Dr. Steinman treated the Plaintiff for a complaint of left knee pain. An MRI revealed medial meniscus tear, bone bruising of the medial tibial plateau, moderate effusion and a grade 1 sprain to the medical collateral ligament. (R. 351.) On October 17, 2003, Plaintiff underwent partial medial and lateral meniscectomies for those problems. (R. 347-48.)

On October 28, 2002, Dr. Eric J. Kron, D.P.M. examined Plaintiff for right ankle pain. Dr. Kron's radiographic impression was osteoarthritis. (R. 264-65.) Dr. Kron injected Plaintiff with steroids and continued conservative treatment therapy. (R. 265.)

---

[27] Doc. 14, p. 4.

Dr. Kron also listed frequent headaches under the review of systems in his report. (R. 263.) On November 15, 2002, Plaintiff reported minimal relief from pain and Dr. Kron suggested an ankle foot orthosis[28]. (R. 260.) Dr. Kron on March 11, 2003 reported that Plaintiff had 50% resolution of the arthritic pain in the right ankle with the use of the patellar tendon brace. (R. 368.)

State Agency physician James J. Green, M.D., M.S. submitted an RFC assessment for Plaintiff, dated December 6, 2002. (R. 271-78.) Dr. Green found that Plaintiff could stand and/or walk for three to four hours and sit six hours in an 8-hour workday. (R. 272.) Additionally, Plaintiff could lift 20 pounds occasionally and 10 pounds frequently. *Id*. Dr. Green noted moderate postural limitations in climbing, balancing, stopping, kneeling, and crouching. (R. 273.) Dr. Green warned that Plaintiff should also never use a ladder, rope or scaffold or crawl. *Id*. Dr. Green concluded that Plaintiff was limited to a sedentary exertional level. *Id*.

Dr. Hanna continued to provide medication to Plaintiff for pain management. (R. 377.) Dr. Hanna noted tenderness in the right knee, right leg and right ankle. *Id*. In July of 2003, Plaintiff reported that his pain scale ranged from 3 to 7 and it was worse at the end of the day. (R. 376.) Plaintiff told Dr. Hanna that the pain was worse at that time because he is taking care of a relative who was terminally ill. *Id*.

On October 16, 2003, Dr. Webb reported that Plaintiff was 40% better since his fusion surgery almost 2 years prior. (R. 375.) Dr. Webb ordered an MRI to look at the disk spaces and neural foramina that appeared post-operation. *Id*. The MRI revealed

---

[28] An external orthopaedic appliance, as a brace or splint, that prevents or assists movement of the spine or the limbs. Lippincott, Williams & Wilkins, Stedman's Medical Dictionary (27th ed. 2000).

disk degeneration, disk bulge and mild facet hypertrophy. (R. 370.) Dr. Bouchlas injected Plaintiff with an epidural steroid at the L3-4 nerve root block. (R. 370.)

Plaintiff was referred to Dr. Raheem for pain management in December of 2003, particularly for low back pain and right extremity pain. (R. 394.) Clinical findings showed decreased range of motion in the spine, however his strength was 5/5 and equal. (R. 395.) In addition, Dr. Raheem noted that Plaintiff had a decreased sensation in the right leg and walked with a limping gait secondary to the discrepancy between the right and left lower extremity. *Id*.

Plaintiff continued to see Dr. Raheem through March 4, 2005. (R. 383-393.) Dr. Raheem reported that Plaintiff was functional and his pain score was a 3 out of 10. *Id*. Dr. Raheem prescribed Plaintiff Lortab, Methadone and Duragesic patches, which controlled the pain to a tolerable level. *Id*. Dr. Raheem's most recent report noted that the back and leg pain was reasonably controlled and that Plaintiff was functional. (R. 383.) His pain score was 5 out of 10 and he continued on his current medications to control the pain. *Id*.

Plaintiff testified at the first hearing that his only source of income was long-term disability, which started in May of 2002. (R. 405.) Plaintiff stated that he could not work because of his back pain, his right ankle pain and the side effects of the medication he was prescribed. (R. 406-11.) He complained that the medication only masked the pain and made him drowsy, and sometimes produced sweating episodes. (R. 409.)

Plaintiff testified that he gained 35 pounds due to inactivity.(R. 401-02.) He testified that he tries to walk a mile daily, take care of his dog and he can lift a gallon of

11

milk. (R. 411-12.) Plaintiff stated that he can comfortably stand for about 30 minutes and sit for an hour. (R. 411.) He testified that he does not do any housework or grocery shopping. (R. 412-13.) He mostly reads magazines and books about railroads and spends 6 hours per week on the computer. (R. 413-14.)

At the supplemental hearing, Plaintiff complained that he has low back pain and takes Methadol to lessen the intensity of his pain. (R. 425-26.) Plaintiff stated that the Methadol makes him tired for about an hour to an hour and a half. (R. 427.) Plaintiff said that for the past two years, he has experienced extreme headaches that last an entire day. However, has not had the ability to take care of the headaches. (R. 430.) He takes regular aspirin to get relief from the headaches. (R. 431.)

Plaintiff testified that he could walk 1/4 a mile and stand for 20 minutes before experiencing low back pain and can sit 45 minutes at once. *Id*. He watches television for 30 minutes per day and uses the computer for 1 1/2 hour increments. (R. 435-36.) Plaintiff testified that he is able to wash dishes, use the microwave and take care of his personal needs. (R. 437-48.) He sometimes goes grocery shopping with his wife. (R. 438.)

Additionally, a VE testified at the second hearing. (R. 417, 442.) The VE testified that the only light job of Plaintiff's past jobs, was an electronic technician, which Plaintiff could no longer perform due to the limitations on his standing and walking. (R. 446.) The VE testified, however, that Plaintiff could perform work as an assembler, a records clerk, an order clerk or an information clerk, which all required the skill level of three. (R.

446-47.) All of the above jobs had to be performed in a full 8-hour workday, 5 days a week. *Id*.

## IV. DISCUSSION

Plaintiff contends that the ALJ erred by failing to consider Plaintiff's absenteeism from work due to medical treatment and by failing to address adequately Plaintiff's complaints of side effects from medication in determining that Plaintiff had the RFC to perform a full range of sedentary work. Plaintiff also maintains that the ALJ improperly applied the pain standard with regard to Plaintiff's subjective complaints of pain and headaches.

For the reasons discussed below, the Court concludes that the ALJ properly determined that Plaintiff could perform a full range of sedentary work and that the ALJ properly evaluated Plaintiff's pain and headaches.

### A. The ALJ Did Not Err In Evaluating Plaintiff's RFC For Sedentary Work

Plaintiff contends that the ALJ failed to address the effect of Plaintiff's excessive absenteeism from work due to medical treatment. Pursuant to Social Security Ruling 96-9P, RFC is the individual's maximum remaining ability to perform work on a regular and continuing basis - 8 hours a day, 5 days a week or other equivalent work schedule.[29] Plaintiff argues that he is not able to perform a full range of work activity at any exertional level because Plaintiff cannot work full time because his medical treatment causes him to be absent from work.

---

[29] SSR 96-8P.

13

An RFC assessment must be based on all of the relevant evidence in the case record.[30] Plaintiff suggests that the record reveals excessive absenteeism from work because Plaintiff was seen by various physicians approximately 24 times from the alleged onset date in January 2002 through November 2003 and that the ALJ failed to take this fact into account. Plaintiff's argument, however, lacks factual or legal support.

While Plaintiff is correct that the record contains documentation evidencing approximately 24 doctor appointments, that does not mean that the mere fact the Plaintiff went to these doctor appointments that he was caused to be absent from work to the extent that the absences themselves impacted the Plaintiff's ability to work. At most, the record evidence of 24 plus doctor appointments simply means that Plaintiff went to a doctor 24 times during a two-year period. There is nothing in any of the documentation to suggest that as a result of Plaintiff attending any of these appointments he was excessively absent from work or for that matter that Plaintiff even missed work at all. Therefore, Plaintiff's suggestion that the frequency of his medical visits, standing alone, was sufficient to establish excessive absenteeism is not supported by the record relied upon by the ALJ.

Further, even assuming that Plaintiff was to continue treatment and follow-up consultations with doctors at the same frequency, there is simply no way to predict how, if at all, attending medical appointments would effect Plaintiff's ability to perform sedentary work on a continuous basis. Accordingly, in the complete absence of any

---

[30] Including medical history, effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms (including pain), evidence from attempts to work, need for structured living environment and available work evaluations. *Id*.

evidence establishing that Plaintiff's ability to perform sedentary work was impacted as a result of frequent doctor visits, the mere fact that Plaintiff saw doctors on more than 24 occasions over a two year period does not constitute substantial evidence of excessive absenteeism. As such, there was no error by ALJ in failing to take into account excessive absenteeism.

Moreover, in addition to the fact that the frequency of Plaintiff's medical visits do not by themselves establish excessive absenteeism, the ALJ found significant that many of the doctor's visits actually improved Plaintiff's medical condition. For example, several of the doctors' appointments in the period between January 2002 and November 2003 were post-surgery consultations, many of which document Plaintiff's significant improvement. (R. 218, 289, 368, 375.) There were also other medical appointments, which document improvements in Plaintiff's condition through the use of a leg brace,[31] surgical procedures, such as the artroscopic meniscectomies, as well as the pain management treatment Plaintiff received, all of which improved Plaintiff's medical condition or alleviated Plaintiff's pain. (R. 347-48, 361, 383.) The ALJ's discussion of these medical appointments thus suggests that the ALJ concluded that many of the medical treatments actually improved Plaintiff's condition rather than causing him to miss work.

Plaintiff also contends that the ALJ did not adequately address the Plaintiff's complaints of side effects from his medications. The ALJ is required to consider the

---

[31] The ALJ properly noted "the orthosis [leg brace] substantially improved his ability to ambulate. (R. 18.)

type, dosage, effectiveness and adverse side effects of any pain medication.[32] A review of the ALJ's decision and of the record, however, discloses that the ALJ expressly considered and took into account the medications Plaintiff was taking.

Contrary to Plaintiff's argument the ALJ mentioned Plaintiff's medications several times in his decision as well as discussing in his decision the various statements made by Plaintiff's physicians regarding the effectiveness of Plaintiff's medications.

In his decision the ALJ made it abundantly clear that he had given due consideration to the effects of Plaintiff's medications. In this regard the ALJ expressly stated that Plaintiff's "side effects of the medication he is taking have been given a great deal of thought and carefully compared to other evidence." (R. 18) Moreover, in addressing whether there were any side effects from Plaintiff's medication, the ALJ found that "[T]here are no significant reports of side effects from medications and that Plaintiff's "medications control his pain." Therefore, there is little question that the ALJ considered the fact that Plaintiff was taking medication and whether there were any side effects that created significant functional limitations.

Moreover, the ALJ's RFC assessment of Plaintiff - as it relates to the side effects from medication - is fully supported by a review of the record. For example, during Plaintiff's treatment by Drs. Hanna and Reheem for pain management, their medical records do not contain any reports of complaints by Plaintiff of the side effects of any medications, including methadol. (R. 374, 376-95.) Further, the records from Drs. Hanna and Reheen evidence that Plaintiff's medications controlled his pain and allowed

---

[32] Polaski v. Heckler, 739 F. 2d 1320 (8th Cir. 1984); SSR 88-13.

him to be functional (R. 374, 376, 392), a finding that is directly contrary to Plaintiff's suggestion that the side effects of Plaintiff's medications were disabling.

Furthermore, the ALJ discussed Plaintiff's own testimony as part of his conclusion that Plaintiff's functioning was not effected by medications. Specifically, the ALJ noted that Plaintiff testified that he walks up to a mile a day, concentrates on reading, completes daily tasks, uses a computer, takes care of his personal needs and drives (R. 435-48), all of which are activities inconsistent with Plaintiff's claims that the side effects from his medications functionally limited his ability to engage in sedentary work.

Accordingly, contrary to Plaintiff's argument, the ALJ explicitly articulated why the record does not support a finding that Plaintiff experiences side effects from his medications, or that the medications Plaintiff was taking functionally affected his ability to work.

**B.      The ALJ Did Not Err In Finding that Plaintiff's Complaints of Pain and Headaches Were Not Severe**

Although the Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's subjective complaints of pain, the sole focus of Plaintiff's argument is upon the pain Plaintiff experienced from headaches. Plaintiff suggests that the ALJ erred by concluding that Plaintiff's headache were not severe or alternatively by failing to consider Plaintiff's headaches in combination with his other limitations.

At the second step of the sequential analysis, the ALJ must "consider the medical severity of the claimant's impairments."[33] In doing so, the ALJ must determine whether the impairments, alone or in combination, "significantly limit" the claimant's "physical or mental ability to do basic work skills."[34] "An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."[35] A diagnosis, however, standing alone is insufficient to establish that an impairment is severe. Plaintiff must also show the effect of the impairment on his ability to work.[36]

The medical evidence supports the ALJ's conclusion that "neither Plaintiff's headaches nor his breathing problems constitute severe impairments." Moreover, even though the ALJ concluded that Plaintiff's headaches were not severe he, nonetheless, went on to discuss Plaintiff's subjective complaints of pain, which by necessity would include Plaintiff's alleged pain from headaches.

The medical records reflect that in May of 2000, Plaintiff complained to a doctor about frontal headaches.[37] (R. 319.) At the supplemental hearing, Plaintiff testified that he gets headaches, but " [I] haven't had the ability to take care of that." (R. 430.) He

---

[33] Wind v. Barnhart, 133 Fed.Appx. 684, 690 (11th Cir. 2005)(quoting Phillips v. Barnhart, 357 F.3d. 1232, 1237 (11th Cir. 2004).

[34] Id.

[35] Id.

[36] Wind, 133 Fed.Appx. at 690 (quoting McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986)).

[37] Plaintiff also states that progress notes from February and March 2002 show complaints of headaches. Also, Dr. Kron listed "frequent headaches" under Plaintiff's history in his report. (Doc. 263).

also stated that he had not seen a doctor about the headaches for two years. *Id*. For relief, Plaintiff testified that he sits back, lays down, relaxes and takes a regular aspirin. (R. 431.) Of the handful of medical records that may mention Plaintiff's susceptibility to headaches, there are no medical records demonstrating that the headaches actually functionally impair Plaintiff's ability to work.  Notably, although Plaintiff complained of having headaches, he never provided any testimony that the headaches actually effect his performance. Therefore, although there was documentation that Plaintiff had headaches there is simply no medical evidence that Plaintiff's headaches were of such a severity as to impair his ability to perform basis work activities.

Furthermore, although the ALJ did not specifically mention Plaintiff's headaches in his RFC analysis - for the simple reason that there was no evidence of limitations from the headaches - the ALJ, nonetheless, addressed Plaintiff's subjective complaints of pain as they relate to Plaintiff's ability to concentrate, a consideration that would be highly relevant to whether Plaintiff's headaches functionally limited him from performing a full range of work at the sedentary level. Accordingly, contrary to Plaintiff's suggestion, the ALJ did consider Plaintiff's subjective complaints of pain - including from headaches - in combination with Plaintiff's other impairments. Therefore, the ALJ did not err in his treatment of Plaintiff's headaches.

In sum, the medical evidence and Plaintiff's own testimony supports the ALJ's decision regarding the lack of functional limitations from Plaintiff's alleged headaches. The substantial evidence of record, at most, documents that Plaintiff complained of frontal headaches for one month and that several progress notes may have noted

complaints of headaches. Most notably, there is no other evidence in the record documenting that Plaintiff's pain from headaches was functionally limiting or that Plaintiff's pain even continued for more than the one month period.

Accordingly, for these reasons, the ALJ did not err in his assessment of Plaintiff's headaches and the ALJ's conclusion that Plaintiff's headaches were not severe is supported by substantial evidence of record.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Ocala, Florida, on February 21, 2007.

_____
GARY R. JONES
United States Magistrate Judge

Copies to:
    The Honorable Wm. Terrell Hodges
    Senior United States District Judge

    Counsel of Record